Good morning, ladies and gentlemen. Our first case for argument this morning is E. D. v. Noblesville School District. Mr. Hoffman. Thank you, Your Honor. May it please the Court. E. D. created two flyers to inform other students about a Noblesville Students for Life Club meeting. The school district's prior restraint policy required her to ask administrators for advance approval to post those flyers. They told her no. The reason? Under the school district's censorship custom, the flyer was too political and not appropriate for high school. The district court green-lighted that censorship. But the prior restraint policy subjects all student flyers to prior approval with no substantive or procedural safeguards, so it's invalid under this court's decision in Fujishima v. Board of Education. And Tinker and the Equal Access Act do not allow the censorship custom's categorical ban on political speech. The district court's application of Hazelwood, a case about a school-sponsored newspaper, to E. D.'s self-created student group flyers was error. This court should reverse. First, the Fujishima case. Controls here. The prior restraint policy said that posters must have administrative approval to be posted. Full stop. There were no criteria for school officials to review posters by. There are no timelines for when their request must be submitted and review complete. And that's exactly the kind of prior restraint that Fujishima prohibits. The unfettered discretion that the prior restraint policy allowed administrators created the confusion and student guesswork with different administrators offering different reasons for denying permission to approve the posters and for rules about what could be on posters in the first place. Defendants don't even cite the Fujishima case, but it is binding law and it applies to the prior restraint policy here. Second, the censorship custom's ban on political and not appropriate speech doesn't meet Tinker scrutiny. The defendants argue that Hazelwood is indistinguishable from this case. But Hazelwood involved a school-sponsored newspaper that was part of a class requirement. The school there selected the editors and publication dates, decided the number of pages for each issue, assigned story ideas to class members, edited stories, and dealt with the printing company. None of that is present here. As Principal McCaffrey said, clubs are student-initiated and student-led. They're not school-sponsored. And the district also admitted that these student groups are not curriculum-based. Noblesville High School recognizes over 70 clubs, including the Young Democrats and the Young Republicans. And as this court has recognized in Hedges, observers will see the potentially conflicting messages on the walls and infer that the school district did not, in fact, endorse those completing and diverse opinions. Rather, the school should teach students about the difference. Mr. Hoffman, the school says that its policy is that the notices on the bulletin board have to be textual rather than pictorial. Is there any evidence to suggest that that is not, indeed, their policy? Yes, Your Honor, there is such evidence. So I think the key piece is document 152 at 53. And there, Principal McCaffrey says that pictures are, in fact, allowed on the walls and allowed on flyers on the walls. And E.D. also knew this, that's at document 152 at 35, because she told Dean Luna that there were other approved posters that, in fact, had pictures. So the school district even seems to recognize this itself. At page 36 of its brief, it recognizes that club descriptions are allowed, so much so that the record reflects other evidence of student posters with pictures on them and discussing other information than the merely factual information Your Honor referenced. And you can see those at document 43-11, 43-12, and 43-13. There are also prior approved posters at document 164-1 at 31 through 33 that contain website information, social media handles, and that sort of information. So the record doesn't support that it's just limited to this factual information. If it were, why would the defendants need to ban political and not appropriate speech if it were really only limited to this factual information? So once the district allows photos on the posters, it must regulate consistent with Tinker. But that doesn't mean it has to do that in the first place, and it doesn't, you know, that rule doesn't tie school officials' hands because they could limit it to factual information, which they did not do here. And they can have other requirements about locations where these flyers can be posted, the time they can be posted, the size of the posters, the number of posters up, and things of that nature. So there are many ways for the school district to properly regulate here. Did any of the other pictures that you're concerned about convey messages? Yes, there were club student logos, so it would have, you know, the Fellowship of Christian. Student logo. Correct. Any others with messages? I'm trying to figure out whether there's any viewpoint discrimination here. I think there is viewpoint discrimination here, Your Honor, based on the testimony of the school officials and the terms that they use here. So first, the school officials testified that the ban on political speech applied to political stances and views on certain controversies, and they examined the content of the message to determine whether or not it took a stance on a political viewpoint. Principal McCaffrey testified that he didn't think that feminism should be a political topic because he recognized it as girl power, and certainly it can be, but there are many different strands of feminism involved. And so picking and choosing which form of feminism is allowed to reject ED's self-professed feminist message for another feminist message is viewpoint discrimination as well. Let me back you up in the timeline, though. You know, it's undisputed, it's agreed between the parties here that the high school let ED form the club over the summer with full knowledge of its mission, and then let ED advertise at the school fair wearing her T-shirt, which had a message on it, with the full 3D board that had the mission, et cetera, posted. So how do you square these two earlier actions with your allegation that the school's decision to revoke the organization's status was motivated by viewpoint discrimination? And if you tell me you squared X, Y, and Z way, which I do want to hear, can you then tell me what's the specific moment at which the defendants went from welcoming ED and her student club for its viewpoint to discriminating against it on the basis of the same viewpoint? When's that point and what changed? The defendants testified that they share the same viewpoints as ED. I think that's certainly true. But what the record reflects is that they didn't want this specific political message in school, even if they themselves agreed with it. No, no, no. But you have to go back to the first part of my question, which is they allowed her to form the club, and they allowed her to advertise at the student fair and sign up, what, 20-odd students at the student fair, allowed her to wear the T-shirt, have the bulletin board at the student fair. Correct. Well, I think you have to look at the rules for what posters are. So they say on posters that you can have pictures, but that they can't be political. And they said that they don't want the political message, and they didn't like the defund Planned Parenthood message on that poster itself. So I think it starts there, because they didn't want that specific message on the walls of the school. That does evince viewpoint discrimination there, too. Even if they disagreed with their views, they still didn't want the controversy. That's viewpoint discrimination if they allow a message that said give Planned Parenthood more money, but banned a message saying defund Planned Parenthood. That's why I'm trying to figure out whether there were any political messages in these postings. In the other posters that I cited, I don't think there was a specific political message beyond the group name and logo. There was evidence in the record at Document 188 of a Black Student Union poster with fists raised in the air, which could be seen as a political message as well. So there was that evidence. But I think, Your Honor, too, what Judge Drovner's concurrence said in Mueller was that just a broad-based ban on political speech, a categorical ban, I think it does discriminate based on viewpoint here, too. How is there a categorical ban? There's certainly a time, place, and manner rule. But everybody agrees that at the meetings, anybody can say anything he or she wants. Right? There's a limit on what you can put on the publicly accessible bulletin board, but no limit on political speech. None that I can see. Am I misunderstanding this? I think that's correct, Your Honor, but on the posters themselves, they do not allow political speech, even though they allowed other sorts of images. But at the clubs themselves, they can engage in whatever speech they wish to. I think the Equal Access Act is informative on that question, Your Honor, because the Equal Access Act defines the limited open forum as any activities that are allowed under the school district's forum. And so they were allowed to post posters, and those posters— No, that's not the definition. Here's the definition. A limited forum, whenever such school grants an opening, an offering, or an opportunity for one or more non-curriculum-related student groups to meet on school premises. There's nothing about bulletin boards in that definition. The definition of a limited open forum is the meeting. And you've just agreed with me, which I think the record shows, that there is absolutely no limit at the meeting. So, so far as the statute is concerned, there's no problem. I don't exactly agree with that, Your Honor, because then— You don't agree that that's what the statute says? Well, I think, Your Honor, if you look at Section 4072, Subsection 3, which defines meetings, as Your Honor pointed out in that text there— I wasn't reading the section defining meeting. I was reading the section defining a limited open forum. Right? You've said that the bulletin board is a limited open forum, and I don't see how that meets the statutory definition of a limited open forum, which talks about meeting on school premises during non-instructional time. The limited open forum not only is the meeting, it has to be during non-instructional time. And these postings on the bulletin board were there during instructional time. So this is not, as a statutory matter, a limited open forum. You may have a constitutional argument, but you do not have a statutory argument. I understand, I think, Your Honor's point. I think that under—if you look at the Mergen's case, though, in that case, the Supreme Court analyzed the limited open forum, which it said did apply to bulletin boards at the school, and so— It was not a case about that definition. Right? If you've got a statutory definition, that's what it is. Mr. Hoffman, tell me what you see as relevant in the statute's definition of meeting, please. Yes, Your Honor. So in Section 4072, Subsection 3, meeting includes those activities, student groups, which are permitted under the school's limited open forum and are not directly related to a school curriculum. And so the defendants admitted in their answer that posting of flyers was permitted by student groups and fall within the definition of the limited open forum. No, it's not within the statutory definition. Would you try to make an argument based on the statutory language for why the bulletin board is a limited open forum? I think because the defendants have defined it that way. No, no, no, no. Look, the statute is what it is. It doesn't get bigger or smaller depending on the defendants' views. Is there an argument that the statutory definition of limited open forum includes a bulletin board? I think, Your Honor, I'd point you just to the definition of meeting before in the Mergen's case, in which the Supreme Court assessed that it would be under a limited open forum. Did the Mergen's case interpret that statute, Section 4071B? I think the Mergen's case viewed what was the definition of a limited open forum because it resolved the confusion between what would be a limited public forum and a limited open forum. And I think in the Mergen's case then it did say that the bulletin boards would fall under the limited open forum. Let me ask you a concrete question. Did the Supreme Court interpret Section 4071B? If it did, we're bound by what it said, but I don't think it did. Maybe I'm wrong. I think I'm not positive, Your Honor, on that point exactly, but I think it did reference bulletin boards in the Mergen's decision itself. Let me ask you about a different case we've done here, which is Morse v. Fett-Frederick. I understand your argument about Tinker and that Tinker would be more appropriate here than Hazelwood, but what do you make of the Supreme Court's decision in Morse v. Frederick? Because if we think of displays on school walls as school-sanctioned, like the school trip in Morse, would the rejection of NFSL's flyers be similarly appropriate under Morse? I don't think so, Your Honor, because Morse essentially established another category of regulable speech. I think if you look at the Supreme Court's decision in Mahanoy Area School District, they went through all the school speech cases and treated them separately. So Morse stands for the proposition that schools can regulate those certain messages in a school-sponsored group for illegal drug use, but that's not what the case is here because Principal McCaffrey said these are not school-sponsored groups. They're student-led and initiated. Not the groups. I'm talking about the walls because here we're dealing with a group that wants to use school walls to post the group's flyer. So that's the parallel I'm asking you about. Well, I think the school could apply Morse here and say on the school walls, we're not going to allow for messages that advocate for illegal drug use because that is what the proposition of Morse stands for. So I think that's another example of how the school could, in fact, regulate walls, but I don't think that it allows them to regulate all political speech in that manner because that's not what Morse stands for, and that can't be what Tinker stands for because the speech there was political after all, and the school had to allow it because it didn't substantially disrupt the message. You're into your rebuttal time, so it may be that you want to address Monell when you get back. I leave that up to you. I think that sounds good. I'll reserve the rest of my time for rebuttal and address Monell. Thank you. Thank you, Counsel. Ms. Roberts. Good morning, Your Honors. My name is Libby Roberts, and I represent the Appalese. May it please the Court. The district court properly concluded that there was no violation of the First Amendment or the Equal Access Act where a high school principal temporarily revoked the status of a club due to specific concerns that the club was not student-led or student-driven and because of the student's refusal to comply with instructions provided regarding student flyers. The district court's decision is correct for four primary reasons. First, there is no basis for Monell liability. Second, the limited public forum cases and the Hazelwood analysis are appropriate framework for this case. Third, there is no evidence in the record that Dr. McCaffrey retaliated against E.D. because she engaged in protected First Amendment activity. And fourth and finally, the club's status was temporarily revoked based upon E.D.'s conduct and not because of the club's speech at any meetings. I think it is important for this court to note that all but one of these claims is an official capacity claim. The only claim that's individual capacity is count six, which is the First Amendment retaliation against Dr. McCaffrey. Every other claim that's before this court needs to be analyzed in the context of Monell. In order for liability to attach to a school district here, there needs to be a showing of a constitutional injury and that that injury was caused by one of three things, either an express policy, a widespread custom, or a person with final policymaking authority who caused the loss. And there are two events that are at issue in this case. The first is the revocation of the club's status and the second is the denial of the flyers. And with regards to each one of those events, we need to look at those three bases for establishing Monell liability. With regards to the first event, the revocation of the club's status, the appellants rely only upon the third option. They only suggest that the injury was caused by a person with final policymaking authority. That's simply not the case. This court has to look to Indiana law to determine who has final policymaking authority. And here, the principal of a high school is an administrator of one building. He is not a policymaker. He can make administrative decisions for that building, but he certainly cannot make policy for the entire district. Indiana has a statute that is 20-26-5-4, which is still remaining good law and on the books. And it says that the school board is the entity that has the authority to make rules, regulations, and procedures for the management of schools, property, facilities, and the activities of the pupils. Since the change, there was a statute that the district court, there were cases the district court relied upon that were a few years old, and there was a statute referred in those decisions that, in fact, has been repealed in part. But nothing about the repeal of that statute has changed Indiana law that says that the school board is the final decision maker. In fact, just in 2014, which was well after that statute was repealed, the Indiana Court of Appeals in MSD of Martinsville v. Jackson specifically said that Indiana Code Article 20 indicates that a school principal's role is mostly administrative, while the responsibility for creating policy lies with the school board. Since there is no basis for Monell liability, Dr. McCaffrey was not a final policy maker, there can be no First Amendment violation with regards to revocation of the club's status. With regards to the denial of the flyers, this is where we talk about whether there's a custom and a policy. And what we know is that the school did have a written policy in their handbook that said that to hang a flyer it needed to be either a school-sponsored event or it had to be approved by an administrator. Now there was also a custom that was not a written policy that said that those flyers had to be hung only in a certain area of the school. So the question before the court now is not whether or not there was a custom or policy, but rather whether that custom or policy violated the First Amendment. The district court found that it did not, and I would agree with that holding and encourage this court to affirm that. Why do we see that they are in the record that there are flyers with pictures, you know, I'm thinking of the Color Guard flyer and mock trial, and how do you account for the discrepancy here, ED's flyers weren't permitted? Certainly, Your Honor. I believe that the Color Guard flyer is actually a school-sponsored event as opposed to a club curriculum. That falls into the other category, school-sponsored events, as opposed to other flyers that are approved. But if you look closely at the record, there is testimony that explains that this is a school with one million square foot under roof, and the process is that the students take the flyer to an administrator, an administrator initials it, signs off on it, puts on there a date on which it has to be pulled down. We did look closely at the record, and that's why we didn't see the initials and the date in the exemplar flyers in the record. That is correct, Your Honor. So what the school has the assistant principal and principal testify to is they cannot always control everything that goes up on the wall until it's up on the wall. Sometimes they have to go take it down. It has to have the blue tape on it. They see a poster that's up without the blue tape, without the initials, and without the date. They know it wasn't approved, and that comes down. So here the school doesn't open up a forum by something merely appearing on the wall. There has to be intent. And the fact that students may hang things someplace in the school that's not allowed and not approved does not open this up to be a public forum. Let me ask you this. Similar to what I was discussing with Mr. Hoffman, the school did allow E.D. to form the club. That is correct, Your Honor. And the school did allow E.D. to display her political, what the school is now calling political signage, on her T-shirt and on her foam board display at the activities fair, but not on the school wall. Why is the school wall different? Certainly, Your Honor. That comes down to why it's relevant to do the forum analysis here. There are numerous cases that say students can wear their shirts, and that is not getting into the imprimatur of the school speaking. And that's what happened here. The student was allowed to wear a shirt conveying her message. The only restriction was she wasn't allowed to put that on the school walls, and that's because the walls are not a public forum. And that's conceded by the appellants in this case. This was, at most, a limited public forum, and the decisions of this court have explained how that's essentially a non-public forum. The walls, this is a school building, and just like any private property owner, the school can control what their property is used for, and they can make sure that it's used for its intended use. There is no evidence in the record that these school walls have ever been allowed to convey any political message for any group, let alone is there evidence in the record that the rules that have applied to club call-out posters have been applied discriminatorily amongst different groups. Rather, what you see in the record is evidence that Noblesville School has, in fact, had prior pro-life clubs, prior religious clubs, and there is no indication that any of those flyers have ever been withheld from being placed on the public walls because of the viewpoint of the clubs at issue. And, Your Honor, I think you hit on a critical point with regards to the retaliation claim. The only way that this retaliation claim can exist is if there is evidence that the action that was taken, in other words, the revocation of the club or the denial of the flyers, was because of a First Amendment-protected activity. And we look at the record as a whole, that's simply not the case. You have to take into consideration the undisputed facts that the school did allow this club to form with full knowledge of the mission and purpose of the club. The school did allow the student to set up at the club activities fair, conveying all of her messages, wearing the t-shirt that she wanted to wear and handing out information about her club's pro-life mission. The only thing that made a difference here that revoked the club's status was the fact that there was this meeting. And if you look at the record, the flyers, there were three emails that specifically told this student how to make her flyers. And all three of those emails said it needs to only have the name of the club, the date, the place, and the location. And on the last email providing that information, the student said, sounds good, thanks, I'll get to work on making the flyers. And instead of doing that, the next morning, the student and her mother came into the school, met with another administrator and talked about these flyers. Dr. McCaffrey was not present at that meeting. But immediately after that meeting, Mr. Luna went out to talk to Dr. McCaffrey and said, hey, this is what happened. I was in this meeting, it was very much a three-way meeting where mom was participating and they were asking about these flyers. Mrs. Mobley was present and she said, I've already given instructions on these flyers. It was based upon that information at that time that Dr. McCaffrey made his decision to revoke the club's status. Once he did that, he went to his office and he wrote an email. And in that email, he explained the basis were those two things. He explained that there is concern over clubs not being student-led and student-driven. He explained that the information on the flyers had been previously addressed. And so from a record as a whole, there is no evidence to support any inference that the reason for the club's revocation was the message conveyed as opposed to the conduct at issue. And then, Your Honor, I would like to touch upon the topic of prior restraint. Counsel for the appellants has cited to the Fujishima case, and I would respectfully submit to this court that that case has been implicitly reversed by both the Mueller and the Hedges decisions from this  The Fujishima case was from 1972, and it said that prior approval requirements were presumptively unconstitutional. If you look at this court's decision in 1996 in Mueller, it said it affirmed and upheld a school's right to have prior approval before an elementary school student distributed flyers. And then in 1993, in the Hedges case, this court also upheld a prior approval policy for religious flyers for a junior high student who wanted to distribute those in a non-public forum. So while neither of those cases specifically referred to Fujishima, both cases did implicitly overturn them. And then in 2005, this court acknowledged the inconsistency between Mueller and Fujishima, and it cited to another case, which was Zook versus Brown, where this court has found that the prior approval of a sheriff before his deputies could make any statements for testimonials or advertisements was constitutionally appropriate. So there is no evidence that the prior approval policy has a presumption of unconstitutionality and that that's the law that applies to this case. Finally, with regards to the Equal Access Act claim, it is important to note that there is no claim asserted in the district court that the denial of the proposed flyers was a violation of the Equal Access Act. Judge Barker noted that in her summary judgment decision. In the briefing in this court, this court, the appellants have pointed to their complaint and said that there was sufficient notice there that an Equal Access Act claim was made related to the flyers. Not only is that not sufficient because we're at the stage where the case has already ruled on summary judgment, the issues and the facts have been briefed and it wasn't raised in their brief below. More importantly, Judge Barker's order requires that all of the parties after discovery submit a statement of claims and defenses for which they have the burden of proof. And in this case, that document 160, the plaintiffs in fact submitted their statement of claims. And once again, they did not assert an Equal Access claim, Equal Access Act claim related to the flyers. Even if they had the same one, framework has to apply to the Equal Access Act claim and the same concepts regarding retaliatory decision-making or the motivation for those decisions has to apply. I just have one matter to go back to you on, on these pictures. So you've just told us pictures. There can be pictures on school sponsored flyers, flyers about school sponsored events and clubs, but no pictures about student interest clubs, which are the solely student led ones. I believe that they I don't know that that is still the policy, but my understanding was that the school sponsored flyers are a separate portion. If you look at the policy, they are, they're identified differently. If so, then why would I believe it was Mr. McCaffrey, but it could have been Mr. Luna goes so far as to say, the pictures you want to include ed are too political as opposed to just saying, since it's a student interest club, you cannot have pictures on your flyer full stop. Yeah. I think the effort there was to explain to the students the difference. And if you read the record, the student says, Hey, I mentioned to Mr. Luna that there were flyers or there were pictures on other flyers. And Mr. Luna says, look, I'm not the person who generally approves these flyers. But my understanding is like, we don't put any political messages up. And so that, that goes across the board, even on the school sponsored ones. But that's from the question of why did the administrator say that? I think he was trying to take that extra step to explain the difference between perhaps the picture that she had seen, um, on that, uh, color guard flyer. But, uh, uh, defendant's position is that he really could have just said, we don't allow pictures on school interest flyers, student interest flyers. That is correct. And if you look at the information that was given to the student in this case consistently, it was for a call out meeting for a student interest club. It can only have these four, four pieces of information. Hmm. Your Honor. And I think what, um, your questions are getting at two goes to the forum analysis that has to be applied here. The concept of whether or not the school has opened up its walls is critical to all of the questions that are being asked here. And that's why that's the framework for this to be analyzed under. There's no evidence that the walls are open. The walls have been opened up, uh, to make it a, a public forum or, or to allow anyone to come in and post paste, put up political messages. There are no other questions from the court. I would conclude the appellants asked this court to affirm the district court's grant of summary judgment in favor of the defendants on all claims. Thank you. Thank you, Ms. Roberts. Anything further, Mr. Hoffman. Thank you,  Uh, first the Monell issue as discussed. So first the school district has a policy and custom, which they admitted to, which then incurs Monell liability. And second, as to the retail, was that argued below? Pardon? The policy and custom. Was that argued below? Uh, defendants admitted to having a policy and custom. And they said that they were constitutional. And E.D. argued about that. The Tinker, the Tinker standard provides the appropriate standard and that she was censored for a pro-life, um, picture. Right. But was there any discussion by judge Barker in her opinion of a Monell theory based on policy and custom? I don't believe that judge Barker, uh, discussed that issue. And was that raised in the briefs below by E.D.? Uh, I, I don't believe it was raised in the briefs below. I think it's officially raised though, because the defendants admitted to having a policy and custom, um, which is the admission and E.D. argued against the censorship. So I don't think there's, there's a direct,  saying this issue, but you know, the issue was not waived. What's the policy that you're saying the district admitted to of having, are we talking about the school sponsored? The one that Ms. Roberts was just discussing the handbook policy. That's correct. The handbook policy. And then the district also admitted,  in the summary judgment briefing that the ban on political and inappropriate content was a custom,  of the school district. Okay. But that argument wasn't made below or analyzed by judge Barker, correct? I don't believe it was argued, analyzed by judge Barker, but I think the argument wasn't necessarily made, but the issue of Monell liability was there. And you know, you waive issues, not our, you waive issues, not arguments. And I think the issue is preserved. Right. But it was, the focus was on McCaffrey, right? That's correct. As a final policy maker or a delegated policymaking authority. Correct. And I believe both the facts and the record bear that out because the Indiana law has changed, which now gives principal McCaffrey authority to write regulations, governing student conduct in the schools without further review. And then the board chair testimony also said that he would have no involvement with clubs. And he expected the principal to write policy regarding clubs that would not be reviewed. So I think both the facts and the law show that there was a delegation of such authority here to principal McCaffrey. The second issue then is on the viewpoint discrimination. I think the record is clear that pictures were allowed on posters, you know, Cliff arts are logos. And again, that's at one 52 dash two at 53, where principal McCaffrey says that, and even document 43 dash 13 is another poster by group sponsored by Mr. McCauley that has a student logo on it, a picture on the flyer. So, so they definitely required posters and they cannot ban political posters since this is a Monell claim. You know, they're not need to be other instances of viewpoint discrimination, but rather the policy itself is viewpoint discriminatory on its face by saying political and not appropriate. Again, principal McCaffrey said, you'd look to the hot topic and culture are different examples of feminism to approve posters or not. And that shows how it is viewpoint, discriminatory discriminatory under the constitution on causation. I think there's two key facts that show it was based on the political flyer proposed, and that's in the revocation email itself. Principal McCaffrey spends two paragraphs talking about the political and not appropriate poster. And then again, when he writes in the times of Noblesville about multiple instances of protocol violations, and he later test on his deposition that that included, you know, having a political poster and Ed wanting to stand on her rights in regards to that poster. I'm on the Fujishima case. There's no such thing as an implicit overruling. I think the Mueller case is now overruled, but Fujishima applied in a high school and this is a high school case again. And so it's directly on point here and applies in this case. And then finally on the equal access act, the plaintiffs raised the censorship issue before the district court at summary judgment. Under the limited open forum, it's defined as meetings during non-instructional time and the posters would be applied during non-instructional time. They're on the walls and students would only be able to see them during non-instructional time. So that does fall under the school's definition of a limited open forum and meetings applies to all activities under that form as indicated in the merchants case. And unless there are any other questions, I respectfully ask this court to reverse. Thank you. Counsel, the case is taken under advisement.